UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KARI MONTANUS,

                                    Plaintiff,

                -v-

COLUMBIA MANAGEMENT INVESTMENT
ADVISERS, LLC d/b/a COLUMBIA
THREADNEEDLE INVESTMENTS,

                                    Defendants.

25 Civ. 2798 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to compel arbitration. Plaintiff Kari Montanus sues her employer, Columbia Management Investment Advisors, LLC, d/b/a Columbia Threadneedle Investments ("Columbia"),[1] for which she has worked for more than 20 years, most recently as a portfolio manager ("PM"). Her six claims allege gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL").

Columbia now moves to compel arbitration. For the reasons that follow, the Court grants the motion.

---

[1] Columbia, formerly known as J&W Seligman, Dkt. 1 ("Compl.") ¶ 26, was renamed in 2008, when Ameriprise acquired J&W Seligman and changed its name to "Columbia Management," *id.* ¶ 29; the name was later changed to "Columbia Threadneedle," *id.* For simplicity, the Court refers to the company as Columbia.

## I.      Background[2]

### A.      The Parties

Montanus resides in New York City.  Compl. ¶¶ 14, 19.  Since 2003, she has been employed by Columbia, and has served in various financial roles, including as an analyst, managing director, and partner.  *Id.* ¶¶ 22, 26, 28.

Columbia is an asset management firm and subsidiary of Ameriprise Financial.  *Id.* ¶ 21. It is headquartered in Boston, Massachusetts, and operates offices throughout the world, including in New York City.  *Id.* ¶ 20.

### B.      Factual History

#### 1.      Montanus Begins Working for Columbia

In January 2003, Montanus began working as an analyst for Columbia's Select Large Cap Value fund ("LCV") and Select Small Cap Value fund ("SCV").[3]  *Id.* ¶ 26.  In 2008, Montanus was promoted to managing director and partner, and, in 2013, to the post of named PM.  *Id.* ¶¶ 28, 32.  She was "highly successful" as a PM.  *Id.* ¶ 1.

#### 2.      Montanus's Allegations Between 2003 and 2018

The Complaint alleges that Montanus's co-worker turned supervisor, Richard Rosen, repeatedly discriminated against her and other female employees.  *Id.* ¶ 2.  When Montanus joined Columbia in 2003, Rosen served as a named PM on LCV and SCV, *id.* ¶ 31; they both reported to Neil Eigen, a senior PM, *id.* ¶¶ 30–31.  In 2014, Eigen retired, and Rosen was promoted to Lead of LCV and SCV.  *Id.* ¶ 33.

---

[2] The following facts, assumed true for purposes of this motion, *see Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024), are drawn from the Complaint, Dkt. 1.

[3] The type of fund—whether "large," "mid" or "small cap"—refers to the level of company capitalizations in which the respective funds have invested.  *Id.* ¶ 27.  As alleged, the more assets under management, the larger the fund, and the more prestigious the work assignment.  *Id.*

##### a.     Rosen's Comments and Behavior

As alleged, Rosen was a "virulent misogynist" who "frequently made hateful and sexual comments toward and about women," constituting sexual harassment. *Id.* ¶ 36.[4] As to hateful comments, in the early 2010s, Rosen implored Montanus to say "Mike Hunt" out loud, in an apparent sexual reference. *Id.* ¶ 48. In or around 2015 or 2016, Rosen sneered at Montanus when she expressed an interest in football, once telling her that "[y]ou only watch football so you can look at Tom Brady." *Id.* ¶ 92. Rosen frequently berated Montanus as "not aggressive enough," commenting that women needed to be "like men" to succeed in investing. *Id.* ¶¶ 78, 81–82, 88. Rosen also used sexual terminology to refer to investing, calling risk management ratios "mental masturbation," and asking a chief executive officer if he had "shot his load" on an acquisition. *Id.* ¶ 55.

As to sexual remarks, Rosen often commented on the appearance of female employees. Over the years, he repeatedly told Montanus that "she was attractive or implied that she was," calling her "prettier" than her predecessor. *Id.* ¶ 75. For example, Rosen, on one occasion, said Montanus's legs were "perfectly shaped," and that she did not have "cankles" like Hillary Clinton. *Id.* ¶ 44. On another occasion, in April 2015, Rosen referred to a secretary that used to work with him as a "hottie," but commented that there was "[n]o way she can still be a hottie because she is so old now." *Id.* ¶ 57. Around spring 2013, Rosen discussed a female co-worker with a male colleague, asking "[w]ho would bang her?" *Id.* ¶ 52. Rosen also stated that Columbia should only hire attractive women for sales roles. *Id.* ¶ 38.

Rosen also frequently disparaged gender-inclusive policies and programs. *Id.* ¶¶ 39, 65, 68. For example, several times between 2003 and 2018, Rosen told Montanus that maternity

---

[4] The following allegations are a representative sample of those pled in the Complaint.

leave was a "joke" and "vacation." *Id.* ¶ 39. In January 2017, Rosen referred to women's networks as "bogus," "BS," and "crap," *id.* ¶ 65; that March, he referred to International Women's Day as a "joke," *id.* ¶ 66; and that April, he called the Ameriprise Women's Leadership Program a "stupid, check the box thing," *id.* ¶ 68.

The Complaint alleges that Rosen engaged in behavior that gave Montanus concern for her physical safety and job tenure. *Id.* ¶ 109. Rosen's behavior included "shaking with anger," "physically menac[ing] Montanus," and "threaten[ing] her job," *id.* ¶ 112; openly fantasizing about committing violence against women, such as "smash[ing] a brick into [a tax analyst's] face to knock some sense into her," *id.* ¶ 116; and ignoring Montanus, sometimes for weeks at a time, *id.* ¶ 110. In or around June and October 2013, Rosen threatened Montanus's job, stating that he would "write Montanus up," unless she "change[d]" and became "'loyal' to him, 'or else.'" *Id.* ¶ 112. Several times between October and December 2013, Montanus reported this incident and Rosen's "incessant rage at her" to human resources. *Id.* ¶ 113. A human resources officer said she would report Rosen's behavior to Columbia's chief investment officer and provide Montanus with updates, but never did. *Id.*

On one occasion, in January 2014, Rosen became physically violent towards Montanus. *Id.* ¶ 114. That day, Montanus entered Rosen's office to discuss certain stocks and trades. *Id.* Rosen, who was "fuming," "yelled that he '[wa]s the boss' and that he 'can do whatever [he] wants.'" *Id.* He then "jumped out of his chair, charged at Montanus, and physically pushed her out of his office, slamming the door in her face." *Id.* Afterwards, Rosen "taunted her via email," telling Montanus to "[w]ork it out with [her] boss," seemingly in reference to Montanus's earlier reports to human resources. *Id.* Montanus "was initially afraid to report Rosen's physical

attack," but later reported the incident to Rosen's supervisor and Columbia's global head of equities. *Id.*

b.    <i>The Reactions and Behavior of Others</i>

During this period, other Columbia employees were aware of Rosen's behavior. *See, e.g., id.* ¶ 122 (U.S. head of equities); *id.* ¶ 125 (former co-worker); *id.* ¶ 127 (lead of LCV and SCV); *id.* ¶ 130 (female PM assistant). For example, in October 2013, a compliance employee, on hearing Montanus worked with Rosen, wished her "good luck," and told Montanus that she "fe[lt] sorry for [her]." *Id.* ¶ 121. In 2014, a client services employee repeatedly told Montanus that Rosen had "problems" with women. *Id.* ¶ 123. In September 2016, a senior marketing employee told Montanus that Rosen was a misogynist. *Id.* ¶ 131.

The Complaint alleges sexist behavior at Columbia by persons other than Rosen. For example, in October 2013, then chief investment officer Colin Moore stated that he was distracted by "all the pretty girls" at a Fox News studio. *Id.* ¶ 146. In 2016, Moore likened investing in Japan to a "one night stand," as opposed to "dating or marrying a woman," because "you just want 'to go in and out.'" *Id.* ¶ 149. Taft, Montanus's co-worker who was later promoted to lead of LCV, also engaged in hostile behavior. *See id.* ¶¶ 34, 56. For example, the Complaint alleges that, in June 2016, Taft "taunted" Montanus about a chief executive officer who "hit[] on" her. *Id.* ¶ 153.

Montanus's co-workers and supervisors defended Rosen, further perpetuating Columbia's hostile work environment. For example, in September 2017, Taft told Montanus that Rosen's "bark is worse than his bite," *id.* ¶ 158, and, the next month, that he knew Rosen said "sexist and racist stuff," but that he "tries not to pay attention" to Rosen's behavior, *id.* ¶ 155. As another example, in April 2017, during the Ameriprise Asset Management Women's Leadership Program, Melda Mergen, global head of equities, denied that there was a boys' club

5

at Columbia despite knowing of Rosen's derogatory comments about her, such as calling her a "bitch," complaining about her "fucking nonsense," and bragging of his "nasty" and "over the top" responses to her. *Id.* ¶¶ 159–60.

        *c.*    *Montanus's Reports to Human Resources*

Between 2013 and 2018, Montanus made numerous complaints about workplace discrimination to human resources, Mergen, and Moore. *Id.* ¶¶ 166–67, 176. In 2013 and 2014, Montanus reported Rosen's "incessant rage toward her," including his "charging at [her] in January 2014 and shoving her out of his office." *Id.* ¶¶ 167, 169. In May 2014, Montanus sent human resources, per Mergen's suggestion, Rosen's "aggressive," "insulting," and "degrading" emails. *Id.* ¶ 171. That same month, Mergen told Montanus that "no one is contesting that Rich [Rosen] mistreats you," but that the company "cannot do anything [about Rosen] because of the business needs." *Id.* ¶ 172. As to harassment in general, in June 2013, Montanus complained to Moore about "the guys" making fun of a women's leadership program to which she had been nominated. *Id.* ¶ 168

Despite this, Mergen and others were dismissive of Montanus's complaints on several occasions, calling them a "he said/she said" situation. *Id.* ¶¶ 170, 177. Mergen displayed increasing hostility towards Montanus after her complaints, *id.* ¶ 165, and Moore threatened to remove Montanus from LCV to resolve the situation, *id.* ¶ 175.

**3.**    **Montanus's Post-2018 Allegations**

In April 2018, in an attempt to protect Rosen, Mergen moved Montanus off the LCV team and onto the SCV and MCV teams. *Id.* ¶ 8. That month, Montanus met with Mergen, who presented leading MCV as an "opportunity." *Id.* ¶ 184. Mergen explained that the move came as a result of Montanus's lack of "chemistry" with Rosen, stating that Montanus would succeed Rosen, and later be named lead of LCV. *Id.* Mergen stated that the SCV and MCV teams "were

comfortable working with women," and "respected women," in contrast to Rosen and the LCV team. *Id.* ¶ 187. Despite these representations, this move in fact was not a promotion, as LCV was more prestigious, managed more assets, and received more analyst support than MCV and SCV. *Id.* ¶ 188. LCV also offered a larger marketing budget and administrative support, as well as more client contact and stability. *Id.* ¶¶ 188–89.

Rosen's harassment of Montanus continued after Montanus's move to the MCV and SCV funds. Between April 2018 and January 2019, Rosen glared at and expressed hostility towards Montanus, once refusing to be on the same investment panel as she. *Id.* ¶ 205. In December 2019, Rosen referred to women as "tokens" who could not be fired. *Id.* ¶ 206. In June 2022, Rosen scoffed at the idea of a female analyst being on maternity leave, and refused to look at Montanus during a meeting. *Id.* ¶¶ 216–17. Rosen also made telling remarks in conversations with others. He told a portfolio trading assistant outside of Montanus's office that "everyone knows you're miserable sitting here," *i.e.*, near Montanus. *Id.* ¶ 224. In November 2023, Rosen told a friend, within earshot of Montanus, that the "tables start to turn in favor of men" after a certain age, in reference to sex. *Id.* ¶ 226.

Others knew of Rosen's treatment of female employees. In December 2021, a media relations employee told Montanus that Rosen was not allowed to speak to the press because of how "inappropriate" and "colorful" he was, "especially when the journalists were women." *Id.* ¶¶ 213–14. In October 2022, a media relations employee stated that she would never allow a supervisee to travel with Rosen "because he might attack her or say offensive or sexist things." *Id.* ¶ 219. And in March 2023, an investment professional described the workplace as "toxic," and said, "no one at the company stands up for women." *Id.* ¶ 225.

Between 2021 and 2024, Montanus resumed complaining about discrimination at Columbia. *See generally id.* ¶¶ 235–74. Her complaints included ones about compensation, promotions, and Rosen's continuing hostility. *See id.* ¶¶ 240, 243, 246. Montanus's repeated complaints made her supervisors, including Mergen, "increasingly hostile toward her." *Id.* ¶ 11. That hostility resulted in Montanus, on October 10, 2023, being passed over, in favor of Taft, for the lead position of LCV. *Id.* ¶¶ 12, 253. On October 13, 2023, in response to this news, Montanus told Mergen she believed the decision not to promote her was based on gender discrimination, particularly given her negative relationship with Rosen, and because she was more qualified than Taft for the role. *Id.* ¶¶ 253–54. Mergen acknowledged that "there [wa]s definitely a component you can attribute [to being passed over] to being female." *Id.*

### C.    Procedural History

On April 3, 2025, Montanus filed an initial Complaint. Dkt. 1. On June 3, 2025, Columbia moved to compel arbitration, Dkt. 8, with a memorandum of law, Dkt. 9 ("Def. Br."), and declaration, Dkt. 10, in support. On June 4, 2025, the Court issued an order directing Montanus to reply to the motion. Dkt. 11. On June 25, 2025, Montanus opposed. Dkt. 15 ("Pl. Br."). On July 21, 2025, Columbia replied. Dkt. 19 ("Def. Reply").

## II.    Motion to Compel Arbitration

### A.    Applicable Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (citation omitted). It provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes that for contractual issues being adjudicated under federal law, "any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). The FAA

was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place

arbitration agreements upon the same footings as other contracts." *Scherk v. Alberto-Culver Co.*,

417 U.S. 506, 510–11 (1974) (citation omitted).

It is undisputed that, were it not for the Ending Forced Arbitration of Sexual Assault and

Sexual Harassment Act of 2021 ("EFAA"), 9 U.S.C. §§ 401–02, Montanus would be required to

resolve her claims in arbitration per the binding arbitration agreement she signed with Columbia.

The EFAA, however, amends the FAA as follows:

> Notwithstanding any other provision of this title, at the election of the person
> alleging conduct constituting a sexual harassment dispute or sexual assault dispute,
> or the named representative of a class or in a collective action alleging such
> conduct, no predispute arbitration agreement or predispute joint-action waiver shall
> be valid or enforceable with respect to a case which is filed under Federal, Tribal,
> or State law and relates to the sexual assault dispute or the sexual harassment
> dispute.

*Id.* § 402(a). The EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct

that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.*

§ 401(4). It defines a "sexual assault dispute" as "a dispute involving a nonconsensual sexual act

or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable

Tribal or State law, including when the victim lacks capacity to consent." *Id.* § 401(3). A court,

rather than an arbitrator, determines whether the EFAA applies, "irrespective of whether the

party resisting arbitration challenges the arbitration agreement," and "irrespective of whether the

agreement purports to delegate such determinations to an arbitrator." *Id.* § 402(b).

Alleged claims must have "accrued on or after March 3, 2022"; the EFAA "does not have

retroactive effect." *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023)

(collecting cases). However, certain causes of action, such as hostile work environment claims,

may "accrue serially: they accrue (and reaccrue) pursuant to the continuing violation doctrine," "with each successive act that is part of the singular unlawful practice." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 87–88 (2d Cir. 2024). Claims that "are subject to the continuing violation doctrine of accrual" may thus be considered timely if the last act in furtherance of the alleged discriminatory practice occurred within the filing period. *Id.* at 88, 91. Accordingly, courts "can hold a defendant liable 'for the entire time period of the hostile environment,' including the period falling outside the limitations period" if it amounts to a continuing violation. *King v. Aramark Servs., Inc.*, 96 F.4th 546, 559–60 (2d Cir. 2024) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

### B.    Discussion

Columbia moves to compel arbitration of all of Montanus's sex discrimination and retaliation claims under the parties' arbitration agreement. Def. Br. at 1. Montanus does not dispute that she executed a valid agreement to arbitrate and that her claims would ordinarily fall within its scope. Pl. Br. at 8. She instead argues that the EFAA bars enforcement of the agreement because she has plausibly pled allegations of sexual harassment that extend beyond the EFAA's March 3, 2022 effective date. Pl. Br. at 18–25.

The Court holds to the contrary, finding the EFAA not to apply, and grants Columbia's motion. The Complaint plausibly alleges sexual harassment by Columbia before March 3, 2022, but it does not plausibly allege conduct thereafter "that is part of the same course of harassing conduct," so as to permit the finding that Montanus's claims "accrue[d], or reaccrue[d]" after the EFAA's effective date. *Olivieri*, 112 F.4th at 88; *see Johnson*, 657 F. Supp. 3d at 550.

### 1.    Whether the EFAA Applies

The EFAA renders unenforceable pre-dispute arbitration agreements "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute."

9 U.S.C. § 402(a).  Salient here, it defines a "sexual harassment dispute" as one "relating to conduct that is alleged to constitute sexual harassment under applicable . . . law." *Id.* § 401(4). By its terms, the EFAA solely applies with respect to any dispute or claim that "arises" or "accrues" on or after March 3, 2022, the statute's enactment date. *Olivieri*, 112 F.4th at 84–85. It does not apply retroactively. *Johnson*, 657 F. Supp. 3d at 550.

As the Second Circuit clarified in *Olivieri*, accrual under the EFAA mirrors accrual in the statute-of-limitations context: discrete acts (*e.g.*, denial of promotion, retaliatory transfers) accrue when they occur, whereas hostile work environment claims may "accrue serially" under the continuing violation doctrine, reaccruing with each act "that is part of the singular unlawful practice." *Olivieri*, 112 F.4th at 87–88 (Title VII and NYSHRL claims) (citing *Morgan*, 536 U.S. at 117); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) (NYSHRL and NYCHRL claims); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (as to NYCHRL claims, if "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice," "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred").  That doctrine, however, "is heavily disfavored in the Second Circuit." *Trinidad v. New York City Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006); *accord Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 50 (S.D.N.Y. 2019).

Since *Olivieri*, courts in this Circuit have emphasized that the continuing violation doctrine does not permit a litigant to pursue claims based on conduct predating the EFAA by citing later dissimilar acts. *See Hoffmann v. Mary Giuliani Catering & Events, Inc.*, No. 24 Civ. 5910, 2025 WL 1616859, at *2–3 (S.D.N.Y. June 6, 2025); *Clay v. FGO Logistics*, 751 F. Supp.

11

3d 3, 17 (D. Conn. Sept. 17, 2024); *see also King*, 96 F.4th at 561; *Johnson*, 657 F. Supp. 3d

at 550. In *Clay*, for example, the court held that the conduct alleged to have occurred after the

EFAA's enactment was dissimilar to the conduct predating it, such that it did not extend the

accrual date of the pre-EFAA conduct. 751 F. Supp. 3d at 17. The pre-EFAA conduct had

consisted of sexual and racist comments; the post-EFAA conduct had consisted of the plaintiff's

retaliatory termination for complaining of discrimination and a hostile work environment. *Id.*

Although termed harassment, the later incidents, the court explained, were "not 'similar in kind'

to the pre-EFAA conduct that form[ed] the basis" of his sexual harassment and hostile work

environment claims. *Id.* Because the retaliatory termination was materially different from the

alleged sexual harassment and discrimination, the Court held, it "cannot be said to be a part of

the 'same course of discriminatory conduct' as his pre-EFAA allegations," and thus could not be

treated as part of a continuing violation. *Id.*[5]

Similarly, in *Hoffman*, the court held that the continuing violation doctrine cannot be

used to attach post-EFAA acts that are "distinct in nature" to pre-EFAA conduct forming the

basis of a hostile work environment claim that was contractually committed to arbitration. 2025

WL 1616859, at *2–3. The plaintiff there argued that defendants, by filing a counterclaim after

the EFAA's enactment, had committed a retaliatory act that caused her hostile work environment

claim, based on conduct that occurred before the EFAA took effect, to re-accrue. *Id.* at *2.

Explaining why the continuous violation doctrine did not apply, the court noted that plaintiff's

---

[5] The court in *Clay* nonetheless found the EFAA to bar enforcement of the arbitration agreement
for a different reason. The retaliation claim independently fell within the EFAA because it arose
from plaintiff's report of sexual harassment. *Id.* at 17–18. And because the EFAA bars
enforcement of an arbitration agreement as to the plaintiff's entire case, not merely to the
individual claims within it that fall within the EFAA, "the EFAA bar[red] enforcement of the
arbitration agreement as to [plaintiff's] entire case." *Id.* at 20.

"hostile work environment allegations—concerning the sexualization of workers and sexual remarks at the workplace—[we]re different in kind from Defendants' act of filing a counterclaim .... [and] cannot render the EFAA applicable to [plaintiff's] hostile work environment claims under ... the NYSHRL." *Id.* It noted, too, that there was a three-year gap between the pre- and post-EFAA conduct, and that the later acts were "so isolated in time that they cannot constitute a continuum of discrimination for the continuing violation to apply," even under the "more liberal" NYCHRL standards. *Id.* (citing *Fitzgerald*, 251 F.3d at 359). Only "specific and related instances of discriminat[ory]" conduct forming part of the same practice, it explained, would permit reaccrual under the continuing violation doctrine. *Id.* at *3.[6]

Applying that line of authority here, Montanus's claims unavoidably accrued before March 3, 2022. In alleging sexual harassment, the Complaint alleges a pattern of sexually charged remarks and threatening behavior by Rosen that occurred between 2003 and 2018, *i.e.*, ending approximately four years before the EFAA's enactment. *See, e.g.*, Compl. ¶¶ 36–187 (Rosen's misogynistic comments, including of Montanus's appearance, and his physical aggression). There are no allegations along these lines after 2018.

The Complaint does allege acts of a different nature after March 3, 2022. It alleges discrete incidents, constituting or indicative of gender discrimination towards Montanus. These include Rosen's refusal to acknowledge her in a meeting, *id.* ¶ 216; his departures from meetings

---

[6] Other courts that have addressed accrual under the EFAA have principally done so in other contexts, such as when a plaintiff experienced harassment *solely* before enactment of the EFAA, but filed a charge with the EEOC or the complaint afterwards. *See Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 413 (6th Cir. 2025) (remanding for district court to determine when the parties' "dispute" arose under the EFAA, noting that plaintiff's injury preceded its enactment, but her EEOC charge was filed afterwards); *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 248 (3d Cir. 2025) ("dispute" arose when plaintiff submitted six complaints to employer before the EFAA's enactment, despite filing EEOC charge afterwards); *Puris v. TikTok Inc.*, No. 24 Civ. 944, 2025 WL 343905, at *5 (S.D.N.Y. Jan. 30, 2025) (same).

when she spoke, *id.* ¶ 222; stray comments by others made in her vicinity, *id.* ¶¶ 218, 224; and Columbia's decision to promote Taft over her in 2023, *id.* ¶¶ 12, 253. It also alleges remarks indicative of gender-discriminatory attitudes, including that with age, the "tables start to turn in favor of men," *id.* ¶ 226, or that Rosen "did not care about maternity leave," *id.* ¶ 217. But the EFAA does not exempt claims of gender discrimination from arbitration agreements. It applies only to claims of sexual harassment (or sexual assault). And the remarks at issue that post-date the EFAA lack the sexualized content required to constitute sexual harassment under the EFAA. *See Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 258–60 (S.D.N.Y. 2024) ("[Plaintiff] . . . has not alleged harassing conduct or the kind of inappropriate comments that would rise to what the courts have determined constitutes 'sexual harassment' under the NYCHRL [or the EFAA]. Holding otherwise would collapse the difference between 'gender discrimination' and 'sexual harassment[.]'" (citing *Johnson*, 657 F. Supp. 3d, and *Baldwin v. TMPL Lexington LLC*, No. 23 Civ. 9899 (PAE), 2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024)); *Smith v. Boehringer Ingelheim Pharm., LLC*, No. 24 Civ. 1266, 2025 WL 2403042, at *9 (D. Conn. Aug. 19, 2025) (gender discrimination claims, absent "unwanted sexual advances, requests for sexual favors, or any other interaction of a sexual nature," do not trigger EFAA); *Moulds v. Skillcycle, Inc.*, No. 23 Civ. 4873, 2024 WL 2206464, at *1 n.1 (E.D. Pa. Mar. 27, 2024) (similar); *Cornelius v. CVS Pharmacy, Inc.*, No. 23 Civ. 1858, 2023 WL 6876925, at *3 (D.N.J. Oct. 18, 2023) (similar), *aff'd in part, vacated in part, remanded*, 133 F.4th 240 (3d Cir. 2025).

In that respect, this case mirrors *Clay*, where the employer's post-EFAA conduct (retaliatory termination) was held not "similar in kind" to its pre-EFAA conduct (sexualized remarks claimed to support a claim of sexual harassment). 751 F. Supp. 3d at 17–18. Likewise, in *Hoffmann*, the litigation conduct (a counterclaim filed years later) could not revive a hostile

work environment claim where the only sexualized conduct long predated the EFAA and was "distinct in nature." 2025 WL 1616859, at *2–3. Here, too, the post-EFAA incidents are separated in time, qualitatively distinct, and not plausibly pled as part of continuing sexual harassment conduct.

The NYCHRL's liberal liability standards do not alter this outcome. *See Fitzgerald*, 251 F.3d at 359; *Johnson*, 657 F. Supp. 3d at 552 (summarizing NYCHRL standards for pleading sexual harassment). Under it, too, "acts so isolated in time from each other or from the timely allegations as to break the asserted continuum of discrimination" cannot establish a continuing violation. *Fitzgerald*, 251 F.3d at 359 (cleaned up); *Hoffman*, 2025 WL 1616859, at *2–3 (similar). Here, the different character and four-year gap between the last pleaded sexualized comment (2018) and Rosen's post-2022 slights foreclose any claim of a single continuing violation.

Finally, the labels the Complaint attaches to its causes of action arising from the post-EFAA conduct—gender discrimination and retaliation for opposition to such discrimination, Compl. ¶¶ 277–300—underscore that their gravamen is unequal treatment based on gender, not ongoing harassment of a sexual nature. And again, "gender based discrimination" does not itself equal "sexual harassment" under the EFAA. *Smith*, 2025 WL 2403042, at *9; *see Singh*, 750 F. Supp. 3d at 258–60 (alleging gender discrimination, not sexual harassment, and thus not triggering the EFAA); *Cornelius*, 2023 WL 6876925, at *4 ("[T]he three-count complaint specifically alleges gender discrimination claims and facts to support discrimination based on sex. . . . [It] does not include a sexual harassment claim or allege any facts to suggest that Defendants engaged in unwelcomed sexual advances or behavior motivated by a sexual desire.").

Accordingly, because the conduct that is plausibly alleged to constitute sexual harassment accrued before March 3, 2022, the EFAA does not apply. Montanus's claims, which fall within the parties' arbitration agreement, must be resolved in arbitration. *See, e.g., Singh*, 750 F. Supp. 3d at 258–60 (compelling arbitration on finding EFAA did not apply); *Smith*, 2025 WL 2403042, at \*11 (same); *Hoffman*, 2025 WL 1616859, at \*3 (same); *Edwards v. CVS Health Corp.*, 714 F. Supp. 3d 239, 250 (S.D.N.Y. 2024) (same); *Cunningham v. CVS Health Corp.*, No. 23 Civ. 1328, 2024 WL 2867303, at \*15 (S.D.N.Y. June 4, 2024) (same); *cf. Clay*, 751 F. Supp. 3d at 17–20 (EFAA did not apply to hostile work environment and sexual harassment claims, but did apply to retaliation claim based on sexual conduct, thereby triggering the EFAA).

### 2.    Whether a Valid Arbitration Agreement Applies

As noted, Montanus does not dispute Columbia's contention that she agreed to a valid arbitration agreement that covers this dispute. *Compare* Def. Br. at 15, *with* Pl. Br. at 8. Because Columbia moves to compel arbitration, the Court nonetheless independently examines this point.

The FAA governs arbitration agreements that affect interstate commerce. *See All. Bernstein Inv. Rsch. & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006). It embodies "a liberal federal policy favoring arbitration agreements." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citation omitted). "Employment contracts, except for those covering workers engaged in transportation, are covered by the FAA." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). When evaluating arbitration agreements, "courts must place arbitration agreements on an equal footing with other contracts," and, in doing so, "enforce them according to their terms." *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011).

Whether a party has agreed to arbitrate is typically resolved by a court. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). In general, "a court may order arbitration

16

of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). "Whether a dispute is arbitrable comprises two questions: '(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.'" *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citation omitted)). If the parties have in fact agreed to arbitrate, the district court must then stay proceedings. *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997).

Here, both elements are established.

First, a valid agreement to arbitrate exists. *See* Dkt. 10-1 ("Arb. Agrmt."). The FAA strongly presumes the validity of arbitration agreements. "Section 2 of the statute makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 649–50 (2022) (citation omitted). No grounds exist to question the validity of the agreement here. It bespeaks adequate consideration, to wit, the parties' mutual promise to arbitrate. *See, e.g.*, *UBS Sec. LLC v. Prowse*, No. 20 Civ. 217, 2020 WL 433859, at *3 (S.D.N.Y. Jan. 27, 2020) (a mutual promise to arbitrate constitutes adequate consideration); *Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 395–96 (S.D.N.Y. 2019) (same); *see also Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 452 (2d Cir. 1995). And Montanus does not assert any grounds, aside from the EFAA, to invalidate or overcome the arbitration agreement.

Second, Montanus's claims fall within the scope of the arbitration agreement. The agreement states that "[a]rbitration is the final, exclusive and required forum for the resolution of all employment-related disputes that are based on a legal claim between Ameriprise Financial

17

and its employees or former employees." Arb. Agrmt. § B; *see also* Def. Br. at 17. The claims here undeniably so qualify. And Montanus has acknowledged that "the employment related disputes subject to arbitration under the policy include any claims arising under any federal, state or local statute, regulation or common law doctrine regarding or relating to employment discrimination, terms and conditions of employment, or termination of employment." Dkt. 10-2 (Montanus's execution of Columbia's Employment Arbitration Policy acknowledgement form).

The Court therefore grants Columbia's motion to compel arbitration. *See, e.g.*, *Singh*, 750 F. Supp. 3d at 259–60 (compelling arbitration); *Edwards*, 714 F. Supp. 3d at 250 (same); *Cunningham*, 2024 WL 2867303, at *15 (same).

## CONCLUSION

For the foregoing reasons, the Court grants Columbia's motion to compel arbitration and stays the action pending the outcome of arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015). The Court respectfully directs the Clerk of Court to terminate the motion pending at docket 8 and to stay this case.

The parties are directed to submit a joint status letter to the Court every 90 days, measured from the date of this decision, advising the Court as to the status of arbitration proceedings.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: September 2, 2025
       New York, New York

18